UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cr-00251-TWP-MJD |
| | ) | |
| ADRIAN BENNETT (08) | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON MOTION TO SUPPRESS**

This matter is before the Court on *pro se* Defendant Adrian Bennett's ("Bennett") Fourth Amendment challenges to the searches of his homes (Filing No. 765 at 2; Filing No. 840). Bennett is charged with Count 1: Conspiracy to Possess with Intent to Distribute Controlled Substances; Count 2: Possession with Intent to Distribute Controlled Substances; and Count 3: Felon in Possession of a Firearm. He petitions the Court to suppress any and all items seized from his residence at 11146 Dura Drive, Indianapolis, Indiana, ("Dura Drive") and his girlfriend's home at 7544 Reflections Drive, Apartment 4, Indianapolis, Indiana ("Reflections Drive"). Additionally, he petitions to suppress his post-*Miranda* statements (made on November 17, 2016) to law enforcement officers. For the reasons set forth below, the Court **denies** Bennett's Motions to Suppress.

### I. BACKGROUND

**A. Procedural History**

The original Indictment in this case was filed on November 15, 2016. Bennett was represented by appointed counsel Mario Garcia ("Garcia"), until February 12, 2018, when he orally moved to terminate his counsel and represent himself. That motion was granted and Garcia was appointed standby counsel. (Filing No. 718.) On February 26, 2018, Bennett filed a *pro se*

Motion of Constitutional Challenge to All Federal Statutes, in which he included (and recited) a Fourth Amendment challenge with no explanation. ([Filing No. 765 at 2.](#)) At the Final Pretrial Conference held on February 28, 2018, Bennett made additional objections including an oral motion to suppress. ("So, basically, I would like to make a motion to suppress.") ([Filing No. 824 at 9.](#)) Bennett also filed a motion for discovery alleging he had not received all of the documents relevant to his case since he began his *pro se* representation. *Id.* at 10-11. During the Final Pretrial Conference, Bennett elaborated on his challenges and the Court ruled on the record with regards to a number of his pending motions to the extent they could be resolved at that time. The Court also ordered standby counsel to ensure that Bennett received all of the discovery that had been turned over to Garcia. *Id.* at 42. The Court denied Bennett's Motion to Strike the Prosecution's Evidence from the record. *Id.* at 44. The Court ultimately ordered the Government to respond in writing to the Motion of Constitutional Challenge ([Filing No. 765](#)). *Id.* at 46.

On March 2, 2018, the Government filed a Response, asserting that Bennett's Fourth Amendment arguments were undeveloped and waived. ([Filing No. 780.](#)) Nevertheless, the Government attached exhibits of the search warrants to its Response in the event that Bennett's argument could be interpreted as attacking the underlying search. On March 7, 2018, the Court denied Bennett's Motion of Constitutional Challenges regarding his Second, Fifth, Eighth, Ninth, and Thirteenth Amendment Constitutional Challenges and took his Fourth Amendment Challenge under advisement. ([Filing No. 797.](#)) On March 8, 2018, Bennett filed a Notice that he requested the assistance of his stand-by counsel and that he wanted to forego self-representation until further notice. ([Filing No. 813.](#)) Garcia represented Bennett for approximately one week before Bennett again terminated his representation and decided to continue *pro se*.

On March 16, 2018, Bennett filed a Supplemental Brief/Memorandum in Support of Defendant's Motion to Suppress. ([Filing No. 839](#).) Thereafter, on March 20, 2018, Bennett filed a second motion, titled Motion to Suppress which is mostly unintelligible and appears to assert theories associated with Bennett's status as a sovereign citizen. ([Filing No. 840](#).)

**B.     Factual Background**

In February 2016, the Federal Bureau of Investigations ("FBI") began an investigation into Jose Zamudio's ("Zamudio") drug trafficking organization, a large-scale conspiracy involving many drug traffickers who were distributing large amounts of controlled substances in the Southern District of Indiana and elsewhere. ([Filing No. 852 at 2-3](#).) As part of the investigation, the Government received judicial authorization to intercept telephone calls between Zamudio and various other individuals in the drug trafficking organization, including Bennett. Bennett was intercepted on numerous occasions discussing narcotics transactions. On November 14, 2016, the Government applied for a search warrant that requested judicial authorization to search thirty-five locations, including thirty residential homes, for evidence of drug activity. ([Filing No. 852-1](#).) Bennett's primary residence, the Dura Drive home, and his secondary location (demonstrated by his spending the vast majority of nights at his girlfriend's apartment) the Reflections Drive apartment, were both listed on the search warrant. That same day, the Magistrate Judge found probable cause and approved the Applications for Search Warrants. During the search of the two residences associated with Bennett, agents located controlled substances, as well as firearms, cell phones, and other drug trafficking paraphernalia. ([Filing No. 852 at 9-10](#).)

Bennett's role in the Zamudio drug trafficking organization is explained in the Affidavit for the Search Warrant application. The Affidavit cites an occasion on October 29, 2016, wherein Zamudio sent another coconspirator, Christian Morales ("Morales"), a text message that stated,

3

"Cousin, if you can, call the black guy and tell him that you will call him when the work is ready. Thank you. I'm going to go to sleep, I feel really sick." (Filing No. 852-1 at 97-98 ¶ 128.) FBI Agent Tim Bates then explained in the same paragraph, "I believe in this text message, ZAMUDIO was asking MORALES to call Adrian BENNETT, and let BENNETT know that he would be receiving a call when the controlled substances (the "work") is available for him to receive." *Id.* On October 31, 2016 (in another intercepted call involving Bennett, Morales, and Jose Zamudio), "MORALES appeared to have been called by ZAMUDIO and BENNETT to act as an interpreter for the two, as ZAMUDIO's English is extremely poor." *Id.* at ¶ 129.

> In this conversation, MORALES told BENNETT that ZAMUDIO had, "one of the white ones right now (that is, a kilogram of cocaine)," and asked BENNETT if he wanted one "of the white ones" right now." BENNETT responded by asking if it was "good snow (that is, what was the quality of the cocaine)." Morales responded it was good, and said ZAMUDIO would let BENNETT look at it before he took it. BENNETT expressed his interest, and then BENNETT passed the phone back to ZAMUDIO to continue their conversation.

*Id*. The Affidavit cites another occasion, on November 3, 2016, where Bennett called Zamudio's Target Phone 10, but another co-conspirator, Juan Zamudio, answered.

> Juan ZAMUDIO answered ZAMUDIO's phone, and in the call, BENNETT said he was calling to check if he (ZAMUDIO) got in touch with, "the guy with the mota (marijuana)." Juan ZAMUDIO could be heard in the background asking Juan ZAMUDIO[1] about the marijuana, and then Juan ZAMUDIO reported it was not yet there, but that they would call BENNETT when it arrived. BENNETT then told Juan ZAMUDIO that he had, "some change (drug proceeds) for him, and also needed, "more of his usual (more controlled substances). Juan ZAMUDIO said as soon as they hear something, they would call BENNETT. BENNETT next reported that he needed, "some ice cream (crystal methamphetamine)." Juan ZAMUDIO was then heard relaying that information to ZAMUDIO, and then telling BENNETT if he wanted to "swing by there (ZAMUDIO's), they are there." BENNETT said he would do so in an hour, and the call concluded.

---

[1] As noted in the Government's Response to Juan Zamudio's Motion to Suppress and the Court's Entry, ¶138 contains a scrivener's error and should read "Juan Zamudio could be heard in the background asking Jose Zamudio", rather than "Juan Zamudio could be heard in the background asking Juan Zamudio. . ." (*See* Filing No. 852 at 6-7; Filing No. 791 at 12).

4

*Id.* at 102-103 ¶ 138. The Affidavit also set forth a connection of Bennett's residences with his drug trafficking activity.

> Based on investigation to date, I believe that Adrian BENNETT resides at, and has unfettered access to, 11146 Dura Drive, Indianapolis, Indiana. Based upon ping data received on BENNETT's cellular phone, he was most recently at this residence at 11:10 p.m. on November 4, 2016. BENNETT went to his Dura Drive home after visiting ZAMUDIO at 1126 South Auburn Street for a period of twenty seven minutes; based on investigation to date, I believe the purpose of that visit to ZAMUDIO was drug related.
>
> Although BENNETT's current residence is 11146 Dura Drive, through investigation, I know that BENNETT currently spends almost every night at the residence of his girlfriend, 7544 Reflections Drive Apartment 4, Indianapolis, Indiana. On October 15, 2016 a vehicle registered to BENNETT through the Indiana Bureau of Motor Vehicles records was observed outside of 7544 Reflections Drive, Indianapolis, Indiana. GPS data from BENNETT's phone confirms that he routinely spends the overnight hours at this residence, through the present time.

*Id.* at 122-123 ¶¶188, 189. The Affiant states that based on his training and experience, he is aware that drug traffickers generally store their drug-related paraphernalia in their residence or the curtilage of their residences. ([Filing No. 852-1 at 111](#).) Bennett was a customer of Zamudio, and he was usually "fronted" drugs, and allowed to pay for those drugs later. ([Filing No. 852 at 4](#).) The Affiant stated that because drug traffickers often "front" controlled substances, they generally maintain records relating to their drug trafficking activities to keep track of amounts paid and owed, and they typically keep these records close at hand to readily ascertain current balances. ([Filing No. 852-1 at 111](#), ¶ 152.) Drug traffickers also keep "pay and owe" records to show balances due for drug payments in the past ("pay") and for payments expected ("owe") to and from the trafficker's supplier and the trafficker's dealers. *Id*.

On the morning of November 17, 2016, the FBI executed the search warrants it had obtained on November 14, 2016, including the warrant for Bennett's current residence, the Reflections Drive apartment. Bennett was arrested early that morning and brought to an FBI

location to be processed and interviewed. Bennett was advised of his *Miranda* rights which he waived. He acknowledged in a post-*Miranda* statement that the Reflections Drive apartment contained his controlled substances, as well as firearms and other drug related items.

## II. LEGAL STANDARD

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. "If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality." *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985). In reviewing the issuance of a search warrant:

> A magistrate's determination of probable cause…should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.

*United States v. Norris*, 640 F.3d 295, 300 (7th Cir. 2011) (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)). Instead of focusing on technical aspects of probable cause, the reviewing court should consider all facts presented to the magistrate. *United States v. Lloyd*, 71 F.3d 1256, 1262 (7th Cir. 1995). And "[w]here the police have acted pursuant to a warrant, the independent determination of probable cause by a magistrate gives rise to a presumption that the arrest or search was legal." *Id*. Probable cause affidavits supporting applications for warrants are to be "read as a whole in a realistic and common sense manner," and "doubtful cases should be resolved in favor of upholding the warrant." *United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000) (citation omitted). A judge determines probable cause exists to search when the "known facts and

circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. U.S.*, 517 U.S. 690, 696 (1996) (citations omitted). "When a search is authorized by a warrant, deference is owed to the issuing judge's conclusion that there is probable cause." *U.S. v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014). Moreover, where "an affidavit is all that was presented to the issuing judge, the warrant's validity rests on the strength of the affidavit." *Id*.

### III. DISCUSSION

Bennett moves the Court to suppress all evidence seized during the illegal search of his home on Dura Drive and his girlfriend's apartment on Reflections Drive. He also moves to suppress the mirandized statement law enforcement officers collected from him on November 17, 2016. (Filing No. 839.) Regarding Bennett's second Motion to Suppress, (Filing No. 840)[2], the motion is **denied** as it is mostly unintelligible and therefore rejected, and any relevant arguments are addressed in the Court's analysis of the arguments made in Filing No. 839.

**A.** **Bennett's Federal Rule of Criminal Procedure Rule 12 Violation**

In a footnote, the Government stated an objection to the untimely filing of Bennett's motions to suppress and his failure to comply with the mandates of Federal Rule of Criminal Procedure 12, or to show good cause for the untimely filing of his motions. (Filing No. 852 at 1.) Rule 12(c)(3) indicates as follows: "Consequences of Not Making a Timely Motion Under Rule

---

[2] On several occasions, Bennett has asserted that he is a sovereign citizen. To the extent that Filing No. 840 relies on theories of individual sovereignty, immunity from prosecution, and their ilk, the Seventh Circuit has instructed that these theories should be rejected summarily, however they are presented. *U.S. v. Benabe*, 654 F.3d 753 (7th Cir. 2011); see *U.S. v. Burke,* 425 F.3d 400, 408 (7th Cir.2005); *United States v. Hilgeford,* 7 F.3d 1340, 1342 (7th Cir.1993) (rejecting the "shop worn" argument that a defendant is a sovereign and is beyond the jurisdictional bounds of the district court); *United States v. Sloan,* 939 F.2d 499, 500–01 (7th Cir.1991); *United States v. Schneider,* 910 F.2d 1569, 1570 (7th Cir.1990) (describing defendant's proposed "sovereign citizen" defense as having "no conceivable validity in American law").

12(b)(3). If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." *Id*.

Pursuant to the Court's Scheduling Order, motions to suppress were due by February 14, 2018. ([Filing No. 704.](#)) Bennett's self-representation began on February 12, 2018, and he did not make the Court aware that he was challenging the search of his home until, at the very earliest, February 26, 2018. At the Final Pretrial Conference he explicitly mentioned he wanted to file a motion to suppress. While the Motion was untimely in that it was after the deadline, the Court finds no violation of Fed.R.Crim.Pro.12(c)(3). The parties acknowledged that as of the date of the Final Pretrial Conference, *pro se* Bennett may not have personally received all of his discovery documents at the jail, even if the documents had been shipped. ([Filing No. 824 at 42.](#)) Bennett explained the substance of his Fourth Amendment challenge at his earliest opportunity, during the final pretrial conference. Bennett has shown good cause in that he contends he had not received all of his discovery and he had just begun self-representation two days before the deadline. Moreover, even if Rule 12 was violated, Bennett is a *pro se* defendant facing a potential life sentence and the Court is obligated to ensure Bennett due process and the opportunity to be heard.

**B.** **Probable Cause**

The Government asserts, and the Court agrees, that probable cause existed supporting the issuance of a warrant to search the Reflections Drive apartment. "Probable cause denotes more than a mere suspicion, but it does not require certainty." *United States v. Anton*, 633 F.2d 1252, 1254 (7th Cir. 1980). In determining whether the content of an affidavit supports a finding of probable cause, the contents "must be seen and weighed, not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v.*

*Cortez,* 449 U.S. 411, 418 (1981). "If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality." *Longmire*, 761 F.2d at 417.

In its response, the Government advises that it is not seeking to admit any evidence from the Dura Drive Home. ([Filing No. 852 at 7.](#)) Despite this advisement, information regarding the Dura Drive home remains relevant to the Court's analysis as this information was included in the Affidavit presented to the impartial magistrate and the Court is required to review all facts presented to the Magistrate Judge.

The Government does not object to Bennett's argument that he had a legitimate expectation to privacy in his girlfriend's home on Reflections Drive, thus he has standing to raise a Fourth Amendment challenge to the search of that residence. Bennett contends that the Affidavit failed to present facts to establish probable cause that drugs would be found in either of the searched properties that were associated with him. ([Filing No. 839 at 3.](#)) The Government concedes that the Affidavit does not articulate any evidence that agents had observed Bennett selling drugs from the Reflections Drive apartment, but asserts that the issuing judge could draw reasonable inferences because evidence of drug activity is often found at the residences of suspected drug traffickers. ([Filing No. 852 at 13.](#)) The parties also agree that a nexus must exist between the crime alleged and the place to be searched, but the Government explains that "on the issue of nexus, 'probable cause does not require direct evidence linking a crime to a particular place" ([Filing No. 852 at 13](#)) (quoting *United States v. Wiley,* 475 F.3d 908, 916 (7th Cir. 2007)).

In *Wiley,* the Seventh Circuit held issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense." *Id.* The Seventh Circuit has noted that there is no categorical rule in this Circuit that there is always

9

probable cause to search a drug trafficker's home simply based on the fact that the defendant is suspected of drug trafficking.

> We agree with the district court that it would be inappropriate to adopt a categorical rule that would, in every case, uphold a finding of probable cause to search a particular location simply because a suspected drug trafficker resides there; we nevertheless conclude that, in this case, a belief that a sufficient nexus exists is supported by the affidavit itself.

*Id.* Based on these principles, this Court must examine the particular facts in the Affidavit and determine whether those facts provide a sufficient nexus. In *Wiley*, a sufficient nexus was found to exist where the affidavit identified that the defendant cooked crack cocaine at the residence at issue. Here, the Affidavit contained an allegation that Bennett returned to his Dura Drive home after spending twenty-seven minutes at Zamudio's address, the home of a known drug supplier. In addition, the Affidavit states that agents believed the purpose of the visit to Zamudio's residence was drug related. The Court finds these facts provide a sufficient nexus for probable cause.

As noted by the Government, the facts in *United States v. Lamon,* 930 F.2d 1183 (7th Cir. 1991), are strikingly similar to those in this case, which involves probable cause when the suspected drug trafficker has two homes. In *Lamon*, the Seventh Circuit found probable cause existed to search a second home, undisputedly unconnected to any drug activity, on the basis of probable cause relating to a *first home which according to a reliable confidential informant,* was used as a place to sell drugs. *Id.* at 1188. The second home was the defendant's primary home, and the first home was his part-time home. An informant indicated that Lamon only sold drugs out of the first (the part-time) home. Based on these facts, the Seventh Circuit held that evidence already seized from the first home, and the detective's experience that drug dealers often hide money, drugs, and other incriminating evidence at their permanent homes, provided a substantial basis for probable cause. *Id.* at 1190.

10

Here, the Affidavit contained a factual averment that on November 16, 2016, Bennett left his Dura Drive home and went into Jose Zamudio's home at 1126 Auburn Street (a known drug headquarters) for twenty-seven minutes, and then he returned to his Dura Drive home. ([Filing No. 852-1 at ¶ 188.](#)) While Bennett is correct that there is no mention that he was seen leaving the Dura Drive home with drugs or returning with drugs, the affiant stated that he believed the purpose of this meeting with Zamudio was drug related. The Magistrate Judge was entitled to draw the reasonable inference that any evidence from Bennett's alleged drug related meeting with Zamudio (and other ongoing drug activity) would be found at the Dura Drive home. Thus, a nexus existed between the place to be searched and the crime alleged. The Affidavit cited other occasions when Bennett was involved in drug trafficking, and that he was "fronted" drugs by Zamudio.

The Reflections Drive apartment was identified in the Affidavit as the place where Bennett spends almost every night, thus, this address is considered a permanent home. In line with *Lamon*, probable cause to search a part-time home (Dura Drive) also provided a substantial basis for probable cause to search the Reflections Drive apartment, despite the fact that the Affidavit did not articulate any evidence that agents had observed Bennett selling drugs from the Reflections Drive apartment. The Magistrate judge could reasonably infer that Bennett was involved in drug activity with regards to both of his residences.

Bennett cites to *U.S. v. Reddrick*, 90 F.3d 1276 (7th Cir. 1996) and the Court's Entry granting his co-conspirator Juan Zamudio's Motion to Suppress. In *Reddrick*, the search warrant for a home was obtained based on information from a confidential informant who told police that he had seen about thirteen kilograms of cocaine inside of the defendant's residence. *Id*. at 1278-79. The confidential informant was known to be reliable. Quoting the Supreme Court in *Zurcher v. Stanford Daily,* 436 U.S. 547, 557 (1978), the Seventh Circuit noted, "[t]he critical element in a

11

reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Reddrick,* 90 F.3d at 1281. The court held that the confidential informant's information regarding the amount of cocaine he saw in the defendant's residence would not alone, be enough for probable cause to search the house. Rather, testimony concerning three controlled buys (which showed the defendant was a drug dealer), combined with the informant's information was sufficient to support issuance of the warrant. *Id.* Bennett's reliance on *Reddrick* is misplaced because the search warrant in *Reddrick* was not based on a defendant's status as an alleged drug dealer alone, but also contained indirect information which linked the drug dealing activity to the defendant's residence.

There are two critical facts which distinguish probable cause in Bennett's Affidavit from the affidavit concerning his co-conspirator, Juan Zamudio. The Court directs the parties to the Entry granting Juan Zamudio's Motion to Suppress for an extensive discussion, but provides context here for the differing results. (*See* Filing No. 791.) First, as noted previously, the Affidavit regarding Bennett contained a factual averment that on November 4, 2016, "Bennett went to his Dura Drive home after visiting Zamudio at 1126 Auburn Street (a known drug dealing headquarters) for a period of twenty seven minutes; based on investigation to date, I believe the purpose of the visit to Zamudio was drug related." (Filing No. 852-1 at 122 ¶ 188.) In contrast, the Affidavit regarding Juan Zamudio stated only that Juan Zamudio lived at a certain address and relied solely on the fact that he was involved in drug trafficking to support probable cause to search his home.

Second, the factual averments regarding Juan Zamudio's involvement in the overall drug trafficking scheme tied him directly to acting at the behest his brother, Jose Zamudio, and that all

of his drug activity took place either at public locations or at Zamudio's home—the drug dealing headquarters. In contrast, no one is alleged to have directed Bennett's actions. Relying on the Court's ruling granting Juan Zamudio's Motion to Suppress, Bennett argues that Zamudio's residence might also serve as the location where all of his drug-related business occurred. Even accepting that inference, the Affidavit here identifies at the very least, that Bennett's Dura Drive home was used for his own drug-related activity. Thus, *United States v. Walker,* 145 F. App'x 552 (2005) (unpublished)[3], a case referenced by the Government in both Juan Zamudio's and Bennett's Motions, is of no value to Bennett as applied to the facts surrounding probable cause for the search of his home. In *Walker*, the DEA agent's assertion that drugs or evidence of drug dealing was likely to be found in Walker's home rested solely on what the agent knew from training and experience, namely, that "drug traffickers generally store their drug-related paraphernalia in their residences." 145 Fed. Appx. at *555. The *Walker* court found there was probable cause based on the DEA agent's assertion and the defendant's status as an alleged drug trafficker. The court noted "while we regard the information tending to show that evidence might be located within the residence as close to the edge, we think that there was enough to support this warrant." *Id*. In Walker's case there was no hint of any other location where Walker would keep materials related to his methamphetamine dealings, and it was logical to infer that such materials existed and would be located at his residence. *Id.* at *555-56.

Although the factual averments presented in Bennett's case are similar to those in *Walker*, unlike *Walker* there is a factual averment that Bennett was at his Dura Drive home just before and after going to Zamudio's residence for drug-related activity. Thus, the Affidavit does not solely rest on the agent's assertion that evidence of Bennett's drug dealing activity is based on the agent's

---

[3] The Court notes *Walker,* an unpublished order, is not treated as precedent. Seventh Circuit Rule 32.1(b).

knowledge from training and experience. As the Government points out, the FBI's belief that Jose Zamudio was dealing drugs at his residence would "not vitiate the concurrent belief that other conspirators would be keeping evidence of their own illegal activity at their own homes", particularly so between a buyer and supplier. ([Filing No. 852 at 16](#).)

C. **The Good Faith Exception**

Even if Agent Bates' Affidavit was insufficient, the Court determines that evidence against Bennett would still be admissible at trial, because the agents relied on the search warrant in good faith. A defendant can rebut the presumption of good faith *only* by showing: (1) that the issuing judge abandoned his or her detached and neutral role, (2) the officers were dishonest or reckless in preparing the affidavit, or (3) the warrant was so lacking in probable cause as to render the officer's belief in its existence entirely unreasonable. *U. S. v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007). Suppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause. *U.S. v. Leon*, 468 U.S. 897, 920 (1984).

As the Government noted, Bennett does not argue that the Magistrate Judge abandoned his appropriate role as a neutral and detached judge, nor does he argue that the agents were dishonest or reckless in the preparation of the affidavit. His sole claim is that the warrant was so lacking in probable cause as to render the officer's belief in its existence entirely unreasonable. The Court is not persuaded.

Agent Bates' Affidavit contained thirty-five locations to be searched. The thirty-five locations included five commercial sites, and thirty residential locations each independently subject to Fourth Amendment protection. (*See* [Filing No. 852-1 at 2-3](#).) Thus, the factual averments presented in the Affidavit were required to support probable cause to search every

location requested to be searched in order to allow the Magistrate Judge to draw reasonable inferences, in compliance with the Fourth Amendment. The Affidavit established a reasonable nexus between Bennett's drug trafficking activity and his Dura Drive home, and in turn, his permanent residence on Reflections Drive. No other location was identified as being a 'headquarters' of Bennett's for use in the drug trafficking where he might keep his 'tools of the trade' other than the residences where he was then residing. As such, it was completely reasonable to believe that contraband would be found in both homes. Bennett may not rely on his supplier, Jose Zamudio's residence, to undercut the general principle that a defendant's alleged status as a drug trafficker is often sufficient, dependent on the facts, to create probable cause.

"The exclusionary rule is a judicially created remedy that prohibits the government from introducing at the defendant's trial evidence of guilt obtained through violations of the Fourth Amendment." *United States v. Ienco,* 182 F.3d 517, 526 (7th Cir. 1999). Based on the facts presented in the Affidavit surrounding Bennett, the Magistrate Judge could reasonably infer that indicia of the drug trafficking activity would likely be found at Bennett's two residences, and he found probable cause existed for the search warrants. In good faith, FBI agents executed those warrants.

### D.    **Suppression of Bennett's Post-*Miranda* Confession**

Bennett also seeks to have his mirandized statements excluded. He argues that the incriminating statements he made during his interview are "fruits of the poisonous tree" and should be suppressed. Specifically, he asserts that he chose to cooperate with law enforcement officers because he thought they had a valid search warrant and would eventually locate drug contraband at his residences. Bennett argues his reliance was misguided as the search was illegal and thus, his post-*Miranda* confession was involuntary. (Filing No. 839 at 8.) In response, the Government

notes that Bennett fails to provide any evidence that his waiver of his *Miranda* rights and subsequent interview occurred as a result of the search of his house. The discussion that the Reflections Drive apartment was being searched did not come up until after Bennett had made many incriminating statements, and the search of the Dura Drive home was not discussed until much later in the interview. Accordingly, the Court finds no evidentiary basis to suppress Bennett's post-*Miranda* statements. In addition, because the Court has ruled that the warrant to search his properties were based on probable cause, suppression of these statements is not warranted.

## IV. CONCLUSION

Having found no violation of Bennett's Fourth Amendment rights, the Court determines the exclusionary rule does not apply and Bennett's Motions to Suppress (Filing No. 765 at 2; Filing No. 840) are **DENIED**. This ruling concludes the Fourth Amendment challenge taken under advisement in the Court's Entry at Filing No. 797.

**SO ORDERED.**

Date: 4/10/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Adrian Bennett, USM #15487-028
Henderson County Jail
380 Borax Drive
Henderson, Kentucky  42420

Mario Garcia
BRATTAIN MINNIX GARCIA
mario@bmgindy.com

Michelle Patricia Brady
UNITED STATES ATTORNEY'S OFFICE
michelle.brady@usdoj.gov

Peter A. Blackett
UNITED STATES ATTORNEY'S OFFICE
peter.blackett@usdoj.gov